UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RICHARD REMELTS,

               Plaintiff,                                  Hon. Ellen S.  Carmody

v.

                                                     Case No. 1:12-cv-110

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.

_____/


**OPINION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security that Plaintiff was entitled to Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act from April 19, 2007, through December 31, 2008, but not thereafter. On June 4, 2012, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment.  (Dkt. #9).  Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive.  For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence.  Accordingly, the Commissioner's decision is **affirmed**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 38 years old on his alleged disability onset date. (Tr. 163, 177). He successfully completed high school and worked previously as a die machine cutter, maintenance worker, truck driver, and driving instructor. (Tr. 17, 218, 232-38).

Plaintiff applied for benefits on October 23, 2008, alleging that he had been disabled since April 19, 2007, due to a back injury and bi-polar disorder. (Tr. 177-84, 246, 275). Plaintiff's applications were denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 83-162). On May 9, 2011, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, David Holwerda. (Tr. 30-74). In a written decision dated June 3, 2011, the ALJ determined that Plaintiff was entitled to a closed period of disability. (Tr. 10-22). Specifically, the ALJ determined that Plaintiff was disabled beginning on April 19, 2007, but that his disability ended on January 1, 2009. The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-6). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On June 22, 2006, Plaintiff was involved in a motorcycle accident in which he suffered the following injuries: (1) closed head injury; (2) pelvic fractures; (3) facial fractures; (4) left pneumothorax; and (5) T3 spinous process fracture. (Tr. 332-33, 364). Plaintiff was not wearing a helmet at the time. (Tr. 425). Plaintiff was also intoxicated at the time of his motorcycle accident and had a history of "alcohol abuse and illicit drug use." (Tr. 397).

Plaintiff's injuries did not require surgery and he was discharged from the hospital on June 28, 2006, to begin therapy at Mary Free Bed Hospital. (Tr. 332-33). Plaintiff was discharged from Mary Free Bed on July 11, 2006. (Tr. 334-71). Treatment notes dated July 21, 2006, indicate that Plaintiff "is undergoing rehab[ilitation] and is expected to make a full recovery." (Tr. 404). On October 10, 2006, Dr. Sohail Qadir reported that Plaintiff "does not have [a] medical condition that would impair his ability to work or drive a commercial motor vehicle." (Tr. 417).

On January 16, 2007, Plaintiff was examined by Dr. Stephen Bloom. (Tr. 415-16). Plaintiff reported that he was "clean and sober" and was participating in an "active treatment program." (Tr. 415). Plaintiff exhibited decreased range of motion in his right shoulder, but the results of a physical examination were otherwise unremarkable. (Tr. 416). Straight-leg raising was negative and Plaintiff's sensation was "intact." (Tr. 416). The results of a drop arm test[1] were also negative. (Tr. 416). The doctor further noted that "from a cognitive standpoint" Plaintiff "has no residual deficits." (Tr. 415). The doctor further noted that Plaintiff "tried returning back to work doing some trucking but his right shoulder pain and leg pain seemed to keep him from tolerating it,"

---

[1] A drop-arm test is used to determine whether the patient is suffering from a possible rotator cuff tear. *See* The Painful Shoulder, available at http://www.aafp.org/afp/2000/0515/p3079.html (last visited on March 4, 2013).

but "he is currently on a vocational search for more light-duty type activities." (Tr. 415). Dr. Bloom concluded:

> He has been through extensive therapy and he was able to show me a number of excellent exercises for his shoulders, back, pelvis, and legs today. The issue is with Richard's compliance. By his own admission, he and his mom both admit he is not doing his exercises on a regular daily basis. I would not recommend further therapy at this point, just that he simply comply with the exercises as recommended.

(Tr. 415).

On March 23, 2007, Plaintiff was examined by Robert Griffith, Ph.D. (Tr. 421-24). The doctor noted that Plaintiff's medical history indicated "ongoing alcohol abuse, drug abuse and mood instability." (Tr. 421). Plaintiff reported that he builds models, watches television, and reads. (Tr. 422-23). The doctor observed that "there was no evidence of tremor or difficulties with mobility." (Tr. 423). Plaintiff's "affect was flat" and "he had difficulties with abstract thinking." (Tr. 423). The doctor observed that Plaintiff "gave one or two word responses for the most part." (Tr. 423). The doctor concluded that Plaintiff "was not overtly hostile, but might have been controlling the information he shared." (Tr. 423). Plaintiff was diagnosed with: (1) alcohol abuse; (2) polysubstance abuse; and (3) cognitive disorder, not otherwise specified. (Tr. 424). Plaintiff's GAF score was rated as 50.[2] (Tr. 424). Dr. Griffith concluded that "until [Plaintiff's] substance abuse clears, it would not be possible to diagnose bipolar disorder." (Tr. 424).

On April 4, 2007, Plaintiff was examined by Dr. Bret Bielawski. (Tr. 425-28).

---

[2] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

Plaintiff reported that following his motorcycle accident, "his left hip has been bothering him and his right shoulder clicks." (Tr. 425). Plaintiff reported that "he is independent in all activities of daily living" and "enjoys fishing and model cars." (Tr. 425). The results of a musculoskeletal examination revealed the following:

> There is no evidence of joint laxity, crepitance, or effusion. Shoulder exam reveals apprehension and impingement signs are positive but only mildly. Drop [Arm test] and Speed's [maneuver][3] are both negative. There is no overt deformity of the shoulder. There was a lot of pain with hip range of motion and scouring of the hip produced pain. Grip strength remains intact. Dexterity is unimpaired. The patient could button clothing and open a door. The patient had no difficulty getting on and off the examination table, no difficulty heel and toe walking and he declined squatting because his left leg locks.

(Tr. 426).

Plaintiff exhibited slightly diminished range of motion in his dorsolumbar spine and left hip, but otherwise range of motion testing of his cervical spine, shoulders, and upper and lower extremities was normal. (Tr. 426-28). The results of a neurological examination revealed the following:

> Cranial nerves are intact. Motor strength and tone are normal. Sensory is intact to light touch and pinprick. Reflexes in the lower extremities are 2+ and symmetrical. Romberg testing[4] is negative. The patient walks with a normal gait without the use of an assist device.

(Tr. 428). The doctor recommended that Plaintiff participate in physical therapy "to try and increase

---

[3] Speed's Maneuver is used to assess biceps tendon instability or tendonitis. *See* The Painful Shoulder, available at http://www.aafp.org/afp/2000/0515/p3079.html (last visited on March 4, 2013).

[4] Romberg test is a neurological test designed to detect poor balance. *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on March 4, 2013). The patient stands with her feet together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and regain her posture. *Id.*

his range of motion."  (Tr. 428).

On November 1, 2007, Plaintiff participated in a CT examination of his lumbar spine the results of which revealed "a large central disc herniation" at L4-5 and a "nonherniated advanced intervertebral disc degeneration at L5-S1."  (Tr. 448).

Treatment notes dated February 4, 2008, indicate that Plaintiff was discharged from physical therapy after canceling or failing to attend six of his nine scheduled appointments.  (Tr. 453).

On March 18, 2008, Plaintiff was examined by Kathryn Burrill, Ph.D.  (Tr. 464-68). Plaintiff reported that he experiences "constant and severe pain" and that he "is unable to bend, and is unable to walk or stand for prolonged periods."  (Tr. 465).  Plaintiff also reported that "he has been experiencing increasingly depressive mood states and irritability."  (Tr. 465).  Plaintiff appeared depressed, but the results of a mental status examination were otherwise unremarkable.  (Tr. 466-68). Plaintiff was diagnosed with: (1) cognitive disorder, not otherwise specified; and (2) major depression, recurrent, severe.  (Tr. 468).  Plaintiff's GAF score was rated as 55.[5]  (Tr. 468).

On April 11, 2008, Dr. Jung Kim completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations.  (Tr. 477-90).  Determining that Plaintiff suffered from a cognitive disorder and major depressive disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.02 (Organic Mental Disorders) and Section 12.04 (Affective Disorders) of the Listing of Impairments.  (Tr. 478-86 ).  The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings.  (Tr. 487).  Specifically, the doctor

---

[5]  A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

concluded that Plaintiff experienced moderate restrictions in the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation.  (Tr. 487).

Dr. Kim also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation.  (Tr. 491-94).  Plaintiff's abilities were characterized as "moderately limited" in seven categories.  (Tr. 491-92).  With respect to the remaining 13 categories, however, the doctor reported that Plaintiff was "not significantly limited."  (Tr. 491-92).

On July 14, 2008, Plaintiff participated in a CT scan of his lumbar spine the results of which revealed "broad-based central disc bulging at L4-5...resulting in mild to moderate stenosis of the thecal sac."  (Tr. 509).  The results of a lumbar myelogram examination, performed the same day, likewise revealed "abnormalities at L4-5."  (Tr. 511).

On July 22, 2008, Plaintiff underwent back surgery.  (Tr. 497).  Specifically, Plaintiff underwent "L4-5, L5-S1 transforaminal lumbar interbody fusion, pedicle screw fixation, and arthrodesis."  (Tr. 497).  X-rays of Plaintiff's lumbar spine, taken the following day, revealed that the "alignment is anatomic" and "no postoperative complications are seen."  (Tr. 629).  X-rays of Plaintiff's lumbar spine, taken July 27, 2008, revealed "no acute abnormalities are present."  (Tr. 627).  X-rays of Plaintiff's lumbar spine, taken September 3, 2008, revealed the following:

> Posterior fusion rods are seen in the lower lumbar spine and there are pedicle screws within the L4-L5 and S1.  Vertebral body height and alignment are grossly maintained.  Post surgical changes overlie the L4-5 and L5 disc spaces.  Bone graft material is seen on the right and on the left.  Posterior hardware is in place in the lower lumbar spine.

No acute abnormality is present in the lumbar spine.

(Tr. 626).

Treatment notes dated September 3, 2008, indicate that Plaintiff "is doing well" following his back surgery and that "overall he has improved as compared to previous to surgery." (Tr. 497). Plaintiff reported that he still "has some back pain," but that "his leg pain is improved." (Tr. 497). An examination of Plaintiff's lower extremities revealed that his "strength is intact at 5/5 bilaterally." (Tr. 497). Plaintiff was given a "tentative back to work date" of December 8, 2008. (Tr. 497).

Treatment notes dated October 3, 2008, indicate that Plaintiff "is doing reasonably well." (Tr. 496). An examination of Plaintiff's lower extremities revealed "strength is intact at 5/5 bilaterally." (Tr. 496). Plaintiff was instructed to participate in physical therapy. (Tr. 496). Treatment notes dated October 29, 2008, indicate that Plaintiff "is doing well" and "has been progressing with his physical therapy." (Tr. 495). Plaintiff reported that "he has no significant pain in his back or his legs, however his back feels stiff on occasion." (Tr. 495). Plaintiff stated that "he is doing quite well." (Tr. 495). Plaintiff was instructed to "continue with physical therapy" and "increase his activity levels." (Tr. 495). Plaintiff was instructed that he could return to work effective December 8, 2008. (Tr. 495).

X-rays of Plaintiff's lumbar spine, taken February 5, 2009, revealed the following:

Laminectomy and posterior fusion changes are again evident at L4-S1. The L4-5 and L5-S1 intervertebral disc cages remain intact and in place, as do the L4, L5 and S1 bilateral pedicle screws and dorsal attachment rod. There are no acute fractures or subluxations and there are no signs of bone destruction from osteomyelitis/diskitis. Posterior fusion bone graft material remains visible bilaterally. The sacroiliac joints are intact. The radiographic appearance of the upper

9

lumbar spine is stable. No acute abnormalities are seen on this study.

(Tr. 625).

Treatment notes dated March 10, 2009, indicate that Plaintiff was being discharged from Arbor Circle counseling services. (Tr. 567-68). Between the dates of November 3, 2008 and March 10, 2009, Plaintiff participated in 14 scheduled group counseling sessions. (Tr. 567). Plaintiff "also continued to attend the group post-completion as 'alumni'." (Tr. 567). With respect to Plaintiff's progress during counseling, it was reported that:

> Rich stated at an exit interview that he felt the group had helped a lot in teaching him more skills to control his anger. He was active in the group and wanted to continue beyond authorized sessions, so came as alumni. Rich developed self-awareness, clarified goals and values and was able to reduce his overall feelings of depression, by his report, though still feeling depressed about not having been able to find work.

(Tr. 567). Plaintiff was diagnosed with 296.90[6] and 303.90[7] in remission. (Tr. 568). Plaintiff's GAF score was rated as 55. (Tr. 568).

On April 10, 2009, Fred Greaves, Ed.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 529-42). Determining that Plaintiff suffered from a major depressive disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 530-38). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular

---

[6] This number appears to refer to the diagnostic codes articulated in the DSM-IV. Diagnostic code 296.90 refers to Mood Disorder, Not Otherwise Specified. *See* DSM Diagnostic Codes for Bipolar Disorder, available at http://psychcentral.com/disorders/sx20-c.htm (last visited on March 4, 2013).

[7] This number likewise appears to refer to the diagnostic codes articulated in the DSM-IV. Diagnostic code 303.90 refers to Alcohol Dependence. *See* DSM Diagnostic Codes for Bipolar Disorder, available at http://psychcentral.com/disorders/dsmcodes.htm (last visited on March 4, 2013).

Listing. (Tr. 539). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. (Tr. 539).

Dr. Greaves also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 525-28). Plaintiff's abilities were characterized as "moderately limited" in six categories. (Tr. 525-26). With respect to the remaining 14 categories, however, the doctor reported that Plaintiff was "not significantly limited." (Tr. 525-26).

On May 21, 2009, Plaintiff participated in a CT scan of his lumbar spine the results of which revealed the following: (1) "stable dorsal decompression and fixation" at L4, L5, and S1; and (2) "mild diffuse disc bulges at the L2-L3 and L3-L4 levels with no significant nerve root compression nor canal stenosis." (Tr. 623).

On May 3, 2010, Physician's Assistant Gary Detweiler completed a form regarding Plaintiff's physical limitations. (Tr. 574-76). Detweiler reported that Plaintiff can "occasionally" lift 10 pounds, but can "never" lift 20 pounds. (Tr. 575). Detweiler reported that during an 8-hour workday, Plaintiff can stand and/or walk "less than two hours" and sit for "less than six hours." (Tr. 575). Detweiler reported that Plaintiff cannot use either of his upper extremities to perform reaching or pushing/pulling activities, but can use his upper extremities to perform simple grasping and fine manipulating activities. (Tr. 575). Detweiler reported that Plaintiff can use both of his lower extremities to operate foot/leg controls. (Tr. 575). Detweiler also reported that Plaintiff experienced

"no" mental limitations. (Tr. 576). On May 21, 2010, Plaintiff reported to Detweiler that he was trying to obtain a "physical labor" position, but had thus far "been unable to do so." (Tr. 600).

Toxicology testing, performed August 20, 2010, revealed that Plaintiff tested positive for cocaine. (Tr. 637). Toxicology testing, performed September 17, 2010, revealed that Plaintiff tested positive for cocaine and opiates. (Tr. 636).

## ANALYSIS OF THE ALJ'S DECISION

The Social Security Act provides that disability benefits may be terminated if "the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling." 42 U.S.C. § 423(f). Termination of benefits must be supported, however, by substantial evidence that (1) there has been medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (2) the individual is now able to engage in substantial gainful activity. *See* 42 U.S.C. § 423(f)(1)(A)-(B); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994); *Niemasz v. Barnhart*, 155 Fed. Appx. 836, 840 (6th Cir., Nov. 18, 2005) ("[o]nce an ALJ finds a claimant disabled, he must find a medical improvement in the claimant's condition to end his benefits, a finding that requires 'substantial evidence' of a 'medical improvement' and proof that he is 'now able to engage in substantial gainful activity'") (quoting 42 U.S.C. § 423(f)(1)).

The social security regulations articulate an eight-step sequential process by which

determinations of continuing disability are made.[8]  *See* 20 C.F.R. §§ 404.1594, 416.994.  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  The steps of this sequential process are as follows:

(1)     Is the individual engaging in substantial gainful activity;

(2)     Does the individual have an impairment or combination of impairments which meets or equals in severity an impairment identified in the Listing of Impairments;

(3)     Has the individual experienced a medical improvement;

(4)     Is the improvement related to the individual's ability to perform work (i.e., has there been an increase in the individual's residual functional capacity based on the impairment(s) present at the time of the most recent favorable medical determination);

(5)     If the individual has either not experienced a medical improvement or any such improvement is unrelated to his ability to perform work, do any of the exceptions to the medical improvement standard apply;

(6)     Does the individual suffer from a severe impairment or combination of impairments;

(7)     Can the individual perform his past relevant work;

(8)     Can the individual perform other work;[9]

*Id.*

Furthermore, when the Commissioner evaluates whether a claimant continues to qualify for benefits, the claimant is not entitled to a presumption of continuing disability.  *See Cutlip*,

---

[8]  This eight-step sequential process clearly applies in cases where a claimant, previously found to be disabled, is later found to be no longer be disabled.  This sequential process also applies in closed benefits cases such as this, where the finding of disability and termination of disability are rendered in the same decision.  *See Niemasz*, 155 Fed. Appx. at 836-40.

[9]  While not expressly stated in the regulations, it is clear that "other" work refers to work which exists in significant numbers.  *See, e.g., Mote v. Shalala*, 1995 WL 358636 at *12 (N.D.Ind., May 12, 1995).

25 F.3d at 286. Rather, the decision whether to terminate benefits must "be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition." *Id.* Nevertheless, the burden of proof to establish that a claimant has experienced a medical improvement which renders him capable of performing substantial gainful activity lies with the Commissioner. *See, e.g., Kennedy v. Astrue*, 247 Fed. Appx. 761, 764-65 (6th Cir., Sept. 7, 2007); *Couch v. Commissioner of Social Security*, 2012 WL 394878 at *10 (S.D. Ohio, Feb. 7, 2012).

The ALJ determined that Plaintiff suffers from: (1) degenerative disc disease (status-post a 2001 laminectomy surgery and July 2008 lumbar spine fusion) with back pain; (2) a history of traumatic injuries secondary to a June 2006 motor vehicle accident (a T-3 fracture, pelvis fracture, and a closed head injury); (3) a cognitive disorder, not otherwise specified; (4) a depressive affective disorder; and (5) a poly-substance abuse disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 14-16).

The ALJ found that from April 19, 2007, through December 31, 2008, Plaintiff "had the residual functional capacity to perform a reduced range of sedentary work," but "was unable to persist in the performance of basic work activities throughout an eight-hour workday or a five-day, 40-hour workweek on a regular and sustained basis." (Tr. 16). Accordingly, the ALJ concluded that Plaintiff was disabled from April 19, 2007, through December 31, 2008. (Tr. 16-18).

The ALJ further concluded, however, that as of January 1, 2009, Plaintiff experienced a medical improvement in his condition. (Tr. 18). The ALJ found that Plaintiff's improvement was related to his ability to work as such resulted in an increase in his residual functional capacity. (Tr.

18).  Specifically, the ALJ determined that as of January 1, 2009, Plaintiff was capable of performing

a limited range of light work.  (Tr. 18-19).  Specifically, the ALJ found that as of January 1, 2009,

Plaintiff retained the ability to perform work activities subject to the following restrictions: (1) he

can lift 10 pounds frequently and 20 pounds occasionally; (2) he can sit and stand/walk for six hours

each during an 8-hour workday, with normal breaks; (3) he can occasionally climb ramps and stairs,

but never climb ladders, ropes, or scaffolds; (4) he can frequently balance; (5) he can occasionally

stoop, kneel, crouch, and crawl; (6) he experiences moderate limitations in the ability to understand,

remember, and carry out detailed instructions; (7) he experiences moderate limitations in the ability

to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

(8) he experiences moderate limitations in the ability to the ability to respond appropriately to

changes in the work setting; (9) he experiences moderate limitations in the ability to the ability to

travel in unfamiliar places or use public transportation; and (10) he experiences moderate limitations

in the ability to the ability to set realistic goals or make plans independently of others.  (Tr. 18-19).

The ALJ determined that as of January 1, 2009, Plaintiff was still unable to perform

any of his past relevant work.  Accordingly, the ALJ questioned a vocational expert to determine

whether there existed other work which Plaintiff could perform consistent with his RFC.  The

vocational expert testified that there existed approximately 29,400 jobs in the state of Michigan an

individual could perform consistent with Plaintiff's RFC.  (Tr. 61-62).  Relying on the testimony of

the vocational expert, the ALJ found that while Plaintiff was unable to perform his past relevant

work there existed a significant number of jobs he could perform despite his limitations.  (Tr. 19-21).

Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

I.      **The ALJ's Finding that Plaintiff Experienced Medical Improvement is Supported by Substantial Evidence**

As noted above, the ALJ determined that as of January 1, 2009, Plaintiff had experienced sufficient medical improvement in his condition that he was able to perform a wide range of work activities. Plaintiff argues that he is entitled to relief because the conclusion that he experienced medical improvement is not supported by substantial evidence. The Court disagrees.

As the ALJ correctly observed, Plaintiff's July 2008 back surgery was successful and alleviated Plaintiff's most severe symptoms. X-rays and CT scans of Plaintiff's lumbar spine, taken following his surgery, were unremarkable and revealed "no acute abnormality" and "no significant nerve root compression [or] canal stenosis." Plaintiff consistently reported that he was doing well and participating in physical therapy. Plaintiff was instructed to "increase his activity levels" and was cleared to return to work effective December 8, 2008. As for Plaintiff's emotional impairments, the record reveals that when Plaintiff discontinued his substance abuse and participated in counseling, he experienced a significant diminution in symptoms. In sum, there exists substantial evidence that Plaintiff experienced a medical improvement in his condition following his back injury and subsequent back surgery. Accordingly, this argument is rejected.


II.     **The ALJ Properly Discounted Plaintiff's Subjective Allegations**

At the administrative hearing, Plaintiff testified that he is unable to work because he experiences difficulties with his memory and ability to learn new things. (Tr. 50-51). Plaintiff testified that he lives with his mother who performs all chores around the house. (Tr. 51-53). Plaintiff testified that he was unable to perform any chores or activities because his "back hurts" and

because it is "hard" for him to "focus." (Tr. 51-53). Plaintiff also testified that he was unable to

even put on his socks and shoes. (Tr. 53). Plaintiff testified that he walks with a cane to prevent

himself from falling. (Tr. 53). Plaintiff reported that he was unable to life a five pound bag of sugar

and could stand for only 15-20 minutes. (Tr. 54-55). Plaintiff testified that he has to lay down

several times throughout the day and gets "ornery" if he does not get 12-13 hours sleep daily. (Tr.

55-57). The ALJ found that Plaintiff's subjective allegations of pain and limitation were not credible

to the extent they were inconsistent with his RFC determination. (Tr. 20). Plaintiff asserts that the

ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical

impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th

Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29,

2002) (same). As the relevant Social Security regulations make clear, however, a claimant's

"statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20

C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th

Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed.

Appx. 981, 989 (6th Cir., Feb. 10, 2009). Instead, as the Sixth Circuit has established, a claimant's

assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an
> underlying medical condition. If there is, we then examine: (1)
> whether objective medical evidence confirms the severity of the
> alleged pain arising from the condition; or (2) whether the objectively
> established medical condition is of such a severity that it can
> reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan*

standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

It is not disputed that Plaintiff suffers from severe impairments. However, as the ALJ concluded, the objective medical evidence, as well as Plaintiff's reported activities, are inconsistent with Plaintiff's allegations of extreme pain and limitation. As previously discussed, the medical evidence reveals that Plaintiff's July 2008 back surgery was successful after which Plaintiff reported

that he was doing well.  Plaintiff was cleared to return to work several months later.  The evidence further reveals that Plaintiff's emotional impairments responded well to treatment and sobriety.  In sum, the ALJ's decision to accord limited weight to Plaintiff's subjective allegations is supported by substantial evidence.

**III.**        **The ALJ Properly Evaluated the Medical Evidence**

As noted above, on May 3, 2010, Physician's Assistant Gary Detweiler completed a form regarding Plaintiff's physical limitations.  Detweiler reported that Plaintiff can "occasionally" lift 10 pounds, but can "never" lift 20 pounds.  Detweiler reported that during an 8-hour workday, Plaintiff can stand and/or walk "less than two hours" and sit for "less than six hours."  Detweiler reported that Plaintiff cannot use either of his upper extremities to perform reaching or pushing/pulling activities, but can use his upper extremities to perform simple grasping and fine manipulating activities.  Detweiler reported that Plaintiff can use both of his lower extremities to operate foot/leg controls.  Detweiler also reported that Plaintiff experienced "no" mental limitations. The ALJ afforded "reduced weight" to Detweiler's opinion.  Plaintiff argues that the ALJ failed to afford sufficient weight to Detweiler's opinion.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Commissioner of*

*Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

As the ALJ correctly observed, Detweiler is a physician's assistant not a physician. As such, he does not qualify as a treating source whose opinion is entitled to deference. *See* 20

C.F.R. §§ 404.1513, 404.1527.  Nonetheless, the ALJ considered Detweiler's opinion and properly

accorded it "reduced weight."  Detweiler's opinions are not supported by the objective medical

evidence nor Plaintiff's reported activities.  Detweiler's contemporaneous treatment notes likewise

do not support his opinion of extreme limitation.  In sum, substantial evidence supports the ALJ's

decision to accord less than controlling weight to Detweiler's opinion.


## IV.            The ALJ Properly Relied on the Vocational Expert's Testimony

Finally, Plaintiff asserts that the ALJ relied upon the response to an inaccurate

hypothetical question.  While the ALJ may satisfy his burden through the use of hypothetical

questions posed to a vocational expert, such hypothetical questions must accurately portray the

claimant's physical and mental impairments.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150

(6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked

whether there existed jobs which an individual could perform consistent with Plaintiff's RFC, to

which the vocational expert indicated that there existed approximately 29,400 such jobs in the State

of Michigan.  The ALJ's RFC determination is supported by substantial evidence and there was

nothing improper or incomplete about the hypothetical questions the ALJ posed to the vocational

expert.  The Court concludes, therefore, that the ALJ properly relied upon the vocational expert's

testimony.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Date: March 13, 2013

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge